Kevin F. Quinn (SBN 106224)
Brett J. Schreiber (SBN 239707)
Jarrett S. Charo (SBN 224001)
THORSNES BARTOLOTTA MCGUIRE LLP
2550 Fifth Avenue, 11th Floor
San Diego, California 92103
Tel: (619) 236-9363
Fax: (619) 236-9653

Brian S. Kabateck (SBN 152054)
Christopher B. Noyes (SBN 270094)
KABATECK BROWN KELLNER LLP
633 West Fifth Street, Ste. 3200
Los Angeles, California 90017
Tel: (213) 217-5000
Fax: (213) 217-5010

Attorneys for Plaintiffs MOJDEH OMIDI AND
AURORA TELLERIA, individually and as
representatives of the class

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Mojdeh Omidi** and **Aurora Telleria,** individually and as representatives of the class,<br><br>Plaintiffs,<br><br>v.<br><br>**Wal-Mart Stores, Inc.**, a Delaware corporation, and **FirstSight Vision Services, Inc.**, a California corporation,<br><br>Defendants. | Case No.: 14CV0857 JAH (BLM)<br><br>**Second Amended Class-Action Complaint**<br><br><br>Dept.:      13B<br>Judge:      Hon. John A. Houston<br><br>**Jury Trial Demanded** |

*(margin text, rotated)* THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

Plaintiff MOJDEH OMIDI ("Omidi") and Plaintiff AURORA TELLERIA ("Telleria" and, together with Omidi, "Plaintiffs") who bring this action on their own behalf and on behalf of all others similarly situated, allege on information and belief as follows:

## NATURE OF THE ACTION

1.      This is a class-action lawsuit brought by Plaintiffs on their own behalf and on behalf of all other persons similarly situated, against Defendants WAL-MART STORES, INC. ("Wal-Mart"), and FIRSTSIGHT VISION SERVICES, INC. ("FirstSight" and, together with "Wal-Mart", "Defendants") for:

1.1.    "Fraudulent" business practices in violation of Business & Professions Code section 17200;

1.2.    "Unfair" business practices in violation of Business & Professions Code section 17200;

1.3.    The dissemination of false and misleading advertisements throughout the State of California which violate Business & Professions Code section 17500; and

1.4.    "Unfair" business practices in violation of Civil Code 1750, et seq.

2.      The purpose of this action is to seek redress from Defendants for any past and present misconduct in violation of California law as described herein and to deter Defendants from engaging in future misconduct in violation of California law as described in the preceding paragraphs.

3.      As a result of the violations of California law described above, Plaintiffs seek the following remedies for themselves and for all others similarly situated:

3.1.    Restitution to the Class of any and all monies or property the Class parted with as a result of Defendants' misconduct complained of

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1  herein;

2        3.2.    Disgorgement from Defendants of any and all monies

3  obtained by Defendants from Plaintiffs and the class as a result of the unfair

4  and/or fraudulent business acts and practices pled herein;

5        3.3.    Actual damages for any violations of the Consumer

6  Legal Remedies Act (except as to FirstSight);

7        3.4.    Punitive damages for any violations of the Consumer

8  Legal Remedies Act (except as to FirstSight); and

9        3.5.    Statutory penalties, where applicable.

10  **PARTIES**

11      4.    Plaintiff Omidi is, and at all relevant times was, a resident of the

12  County of San Diego, State of California. Plaintiff Omidi brings this action

13  individually and on behalf of the Class of other similarly situated

14  individuals.

15      5.    Plaintiff Telleria is, and at all relevant times was, a resident of

16  the County of San Diego, State of California. Plaintiff Telleria brings this

17  action individually and on behalf of the Class of other similarly situated

18  individuals.

19      6.    Defendant Wal-Mart is a Delaware corporation with its

20  corporate headquarters in Bentonville, Arkansas.  At all times relevant to

21  this complaint, various California Wal-Mart stores have been registered as a

22  "dispensing optician" in the State of California.  However, Wal-Mart is not,

23  and has not been, licensed as an optometrist in the State of California.

24      7.    FirstSight Vision Services, Inc. ("FirstSight") is a California

25  corporation with its principal place of business in Upland, California.

26  FirstSight is registered with the California Secretary of State and maintains

27  an agent for service of process at 2710 Gateway Oaks Drive, Suite 150N,

28  Sacramento, California 95833.  FirstSight is not, and has not been, licensed

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 2 -

1  as an optometrist in the State of California.

2  <center>**JURISDICTION & VENUE**</center>

3    8.    Wal-Mart maintains numerous wholesale retail locations

4  throughout the State of California and therefore conducts professional and

5  commercial activities in the State of California on a substantial, continuous,

6  and systemic basis sufficient to subject Wal-Mart to the general personal

7  jurisdiction of the courts of the State of California.

8    9.    FirstSight engages in continuous and regular commercial

9  activity in the State of California consisting of forming and maintaining

10  lease arrangements between itself and California optometrists interested in

11  practicing in Wal-Mart stores.

12    10.    While Defendants are subject to the general personal

13  jurisdiction of the courts of the State of California as set forth in the

14  preceding paragraphs, the claims asserted in this complaint arise out of the

15  Defendants' professional and commercial activities within the State of

16  California, and therefore Defendants are also subject to the specific personal

17  jurisdiction of the courts of the State of California for purposes of this

18  lawsuit.

19    11.    The claims asserted in this Complaint arise out of acts,

20  transactions, and conduct that occurred with the County of San Diego, and

21  therefore this action is properly venued in the County of San Diego.

22    12.    Defendant Wal-Mart removed this case from the Superior Court

23  for the County of San Diego to this Court on April 9, 2014, under the "Class

24  Action Fairness Act," 28 U.S.C. § 1332(d), based on the assertions that there

25  was minimum diversity, that there were more than 100 putative class

26  members, and that the aggregate amount in controversy in the putative

27  class exceeded $5,000,000. To the extent those assertions were true before

28  they remain true now.

<div style="margin-left:2em; writing-mode:vertical-lr;">THORSNES BARTOLOTTA MCGUIRE<br>2550 FIFTH AVENUE, 11TH FLOOR<br>SAN DIEGO, CALIFORNIA 92103<br>TEL: (619) 236-9363<br>FAX: (619) 236-9653</div>

<center>- 3 -</center>

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

## CLASS ALLEGATIONS

13.     Plaintiffs bring this class action pursuant Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the class of similarly situated individuals.

14.     The class is defined as follows:

**All persons who, from four years preceding the filing of Plaintiff Omidi's original complaint in this action (*i.e.*, November 5, 2013) through resolution of this action, inclusive, paid for an eye examination from an optometrist at a Wal-Mart location in California.**

15.     The joinder of all class members in a single conventional action is impracticable due to the sheer number and geographical diversity of potential claimants. The disposition of these persons' claims in a class action will provide substantial benefits to both the parties and the Court. The class is ascertainable and maintains a sufficient community of interest. The rights of each member of the class were violated in a similar fashion based upon Defendants' misconduct.

16.     The class representatives' claims are typical of the claims of the members of the class because Defendants' wrongful conduct arises out of Defendants' established custom and practice, and thus the class representatives and members of the class were damaged by the same wrongful acts in a similar way.

17.     Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs are unaware of any current or potential conflicts of interest with the prospective class. Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the other class members.

18.     Plaintiffs have retained counsel that are competent and experienced in class-action litigation in general, and consumer class actions of this sort in particular, and are currently counsel in several pending

- 4 -

1  putative or certified class actions, not including this action.

2      19.    Questions of law and fact common to the members of the class

3  predominate over questions that may affect only individual members.

4  Among the questions of law and fact common to the entire class are the

5  following:

6      19.1.    Whether Defendants have engaged in, or aided and

7  abetted the commission of, "fraudulent" business practices in violation of

8  Business & Professions Code § 17200 through the nature of their operations;

9      19.2.    Whether Defendants have engaged in, or aided and

10  abetted the commission of, "unfair" business practices in violation of

11  Business & Professions Code § 17200 through the nature of their operations;

12      19.3.    Whether Defendants have violated, or aided and abetted

13  the commission of, Business & Professions Code § 17500 through the nature

14  of their operations; and

15      19.4.    Whether Defendants have violated, or aided and abetted

16  the violation of, Civil Code § 1750, et seq., through the nature of their

17  operations;

18      19.5.    Whether Plaintiffs and the members of the class have

19  sustained damages as a result of any or all of the above-described

20  misconduct, and if so, the proper measure of those damages;

21      19.6.    Whether Defendants have received unjust enrichment

22  and/or ill-gotten gains through the commission of the misconduct

23  complained of herein, and if so, the amount of that unjust enrichment

24  and/or ill-gotten gains that should be disgorged and/or restored;

25      19.7.    Whether Plaintiffs and the members of the class should

26  be awarded punitive damages as a result of any or all of the above-

27  described misconduct, and if so, the proper measure of those damages; and

28

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1    19.8.   Whether Plaintiffs and the members of the class are
2    entitled to any equitable relief as a result of any or all of the above-
3    described misconduct, and if so, the nature of that relief.

4    20.   A class action is superior to other methods for the fair and
5    efficient adjudication of this controversy. The class members are so
6    numerous that joinder of all members into a conventional lawsuit is
7    impracticable. A class action will permit a large number of similarly
8    situated persons to simultaneously prosecute their common claims in a
9    single forum efficiently and without the duplication of effort and expense
10   that numerous individual actions would entail. There are no difficulties
11   likely to be encountered in the management of this class action that would
12   preclude it from proceeding as a class action.

13                      **GENERAL FACTUAL ALLEGATIONS**

14   **A.   California law regards optometry as a learned profession and**
     **maintains a long-standing prohibition on arrangements that enable**
15   **corporations to exert direct or indirect influence over optometrists.**

16   21.   The early historical development of "optometry" was rooted in
17   a conflict between business interests that regarded optometrists as mere
18   agents in the sale of eyewear to customers, and those who believed the
19   profession was designed to provide professional medical services to
20   patients.

21   22.   In the early 1900s, optometrists were commonly working for or
22   within retail establishments such as department stores, jewelry stores and
23   drug stores. These full scale optometry departments were then touted in
24   massive newspaper and radio advertising campaigns about doctors at the
25   ready to perform exams and the ease and convenience of on-site eyewear
26   purchases.

27   23.   But many optometrists were concerned that such practices
28   compromised their profession's integrity as it required optometrists to be

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 6 -

1   sellers of glasses first, and providers of clinical care to their patients second.

2   24.   In 1903, California took the first step toward alleviating this

3   concern by recognizing and regulating optometry as a profession by

4   enacting the Optometric Practices Act legislation, becoming just the second

5   state in the United States to statutorily regulate the profession of optometry.

6   25.   In doing so, the State of California formally regarded optometry

7   as a healing art and a learned profession. As such, optometrists who

8   practice in California must be licensed by the State Board of Optometry. To

9   do so, an individual must have a Doctor of Optometry degree from a

10  recognized school of optometry and must pass a standardized test

11  administered by the Board of Optometry. Once licensed, optometrists are

12  permitted to conduct eye examinations to detect refractive errors and eye

13  diseases, and to prescribe corrective lenses.

14  26.   The decision to recognize the practice of optometry as a learned,

15  healthcare profession was significant because the State of California has

16  historically maintained, and continues to maintain, a strong public policy

17  against corporate control of learned professions such as medicine.

18  27.   The State maintains this policy out of well-founded fears that

19  arrangements which tied an optometrist's economic livelihood to the

20  success of a for-profit corporation would present optometrists with a

21  conflicts of interest between a desire for profit and the best interests of their

22  patients. The California Supreme Court succinctly summarized this policy

23  and the rationale behind it in *People v. Cole*, 38 Cal.4th 964 (2006):

24          California law also restricts the relationships that optometrists
           may have with corporations. In general, under California's
25          long-standing "policy . . . against [the] corporate practice of the
           learned professions," for-profit corporations "may not engage
26          in the practice of . . . medicine." (*People v. Pacific Health Corp.*
           (1938) 12 Cal.2d 156, 158-159 (*Pacific Health*).) The ban on the
27          corporate practice of medicine generally precludes for-profit
           corporations—other than licensed medical corporations—from
28          providing medical care through either salaried employees or

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

independent contractors. (*Ibid.*; *Conrad v. Medical Bd. of California* (1996) 48 Cal.App.4th 1038, 1047-1048 [discussing exceptions].) It has been held applicable with respect to optometrists. (*California Assn. of Dispensing Opticians v. Pearle Vision Center, Inc.* (1983) 143 Cal.App.3d 419, 427 (CADO).) Courts have said that the ban on the corporate practice of medicine "is intended to ameliorate 'the evils of divided loyalty and impaired confidence' which are thought to be created when a corporation solicits medical business from the general public and turns it over to a special group of doctors, who are thus under control." (*Conrad v. Medical Bd. of California*, *supra*, 48 Cal.App.4th at pp. 1042-1043.)

28.    No doubt perceiving these and other perils that would inevitably arise any time a corporation in the business of selling eyewear has control or influence over an optometrist, the State of California long ago implemented a number of laws in an effort to insulate optometrists from control by non-healthcare commercial entities.

29.    To that end, as far back as the 1923, California prohibited the employment of an optometrist by a non-licensee corporate entity.

30.    In 1939, the California Legislature enacted Business and Professions Code section 2556 to incorporate the 1923 prohibition against the employment of an optometrist by a non-licensee business.  It further expanded the prohibition to include both contractual/leasing agreements as well as direct employment arrangements.

31.    The 1939 legislation was necessary as California realized large numbers of optometrists were operating in commercial retail settings which resulted in optometrists being beholden to business entities. Such situations were determined to be contrary to public policy as optometrists were perceived as commercial sellers of eyewear as opposed to professional providers of medical services.  California Business and Professions Code § 2556 diminished the ethical concerns of the profit-driven pressure to sell eyewear as opposed to tending to the specific medical needs of patients.

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

32.   Between 1939 and the 1960s, California's prohibitions on associations between corporations and optometrists continued to evolve as major eyewear retailers continued to devise innovative and creative schemes to circumvent California law.

33.   At all times relevant to this complaint California law in this area consisted of, among other provisions, the following regulations:

33.1.   Business & Professions Code section 655, which prohibited optometrists from, among other things, having "any membership, proprietary interest, coownership, landlord–tenant relationship, or any profit-sharing arrangement in any form, directly or indirectly," with any dispensing optician.

33.2.   Business & Professions Code section 2556, which made it unlawful for a dispensing optician to "advertise the furnishing of . . . the services of an optometrist," or to "directly or indirectly employ or maintain [an optometrist] on or near the premises used for optical dispensing."

33.3.   Business & Professions Code sections 3040 and 3041, which prohibit lay corporations from "engag[ing] in the [unlicensed] practice of optometry."

33.4.   California Code of Regulations, title 16, section 1399.251, which provides that it is unprofessional conduct for a registered dispensing optician to "advertise the furnishing of services of an optometrist."

33.5.   California Code of Regulations, title 16, section 1514, provides, among other things, that when "an optometrist rents or leases space from and practices optometry on the premises of" a commercial entity, the "practice shall be owned by the optometrist *and in every phase be under his/her exclusive control*." (Emphasis added.)

33.6.   Notably, the California Legislature, no doubt anticipating that eyewear retailers might use intermediaries to facilitate otherwise

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1  prohibited relationships with optometrists, presciently prohibited eyewear
2  retailers from "*directly or indirectly*" engaging in any of the prohibited
3  practices. Moreover, California law not only makes it a crime for eyewear
4  retailers and optometrists to violate the aforementioned laws and
5  regulations, but also extends criminal liability "to any and all persons,
6  whether or not so licensed under this division, who participate with such
7  licensed person in a violation of any provision of this section." *E.g.*, Cal.
8  Bus. & Prof. Code § 655.

9      34.   And yet, despite the unequivocal laws banning the practice,
10  many eyewear retailers, including Wal-Mart, could not resist the
11  tremendous business opportunity associated with co-locating optometrists
12  in their stores. Not only would the prospect of an on-site exam draw
13  customers to the retailer's store, but the customers would be more apt to fill
14  the resulting prescription at the store than take it elsewhere. The result
15  would be significantly more eyewear sales than without an on-site
16  optometrist.

17      35.   But as one might expect, eyewear retailers' practice of forming
18  prohibited associations with optometrists was not without controversy. In
19  1983, the California Court of Appeal ruled that franchisor–franchisee
20  relationships between eyewear retailers and optometrists were illegal under
21  California law. *See Cal. Ass'n of Dispending Opticians v. Pearle Vision Center,*
22  *Inc.*, Cal. App. 3d 419 (1983). And in 2009, the California Supreme Court
23  held that a model in which an eyewear retailer indirectly employs
24  optometrists through an intermediary healthcare plan was also a violation
25  of California law. *See People v. Cole*, 38 Cal. 4th 964 (2006).

26      36.   Frustrated at the court decisions expressly prohibiting
27  seemingly every conceivable form of association between an eyewear
28  retailer and an optometrist, yet unwilling to give up the massive profits

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 10 -

associated with one-stop optical shopping, the eyewear retailers, led by their trade group, the "National Association of Optometrists and Opticians," filed declaratory relief actions in federal court, seeking to strike down Business and Professions Code sections 655 and 2556 among other provisions.

37.   In successive decisions, the Ninth Circuit upheld the California laws banning associations between eyewear retailers and optometrists. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144 (9th Cir. 2012); *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521 (9th Cir. 2009). When their desperation petition for certiorari was denied by the U.S. Supreme Court, *see Nat'l Ass'n of Optometrists & Opticians v. Harris*, 133 S. Ct. 1241 (U.S. 2013), the eyewear retailers' protracted legal efforts to maintain their illegal business models came to a close.

38.   But the eyewear retailers' were not yet ready to abandon their business model. Instead of the courts, the retailers turned their attention to Sacramento.

39.   In 2015, 76 years after California Business and Professions Code section 2556 was first enacted, the eyewear retailers—including Wal-Mart, Costco, and Luxottica—attempted to fast-track a bill through the Legislature and the Governor's office that, if adopted, would have been tantamount to a repeal of Business and Professions Code sections 655 and 2556.  A true and correct copy of the initial draft of the bill that was being sponsored by Luxottica, AB 684 is attached hereto as Exhibit "A."

40.   The original versions of the bill sponsored by the eyewear retailers were designed to immunize them in this litigation by legalizing the very conduct alleged by the putative class.

41.   As AB 684 worked its way through Sacramento, the revised version that was being discussed in 2015 was designed to give the eyewear

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1   retailers in this and the related putative class actions a moratorium on

2   enforcement of the statute. This included, but was not limited to, the

3   moratorium on *new* civil lawsuits and administrative and criminal

4   prosecution for employing optometrists and/or entering into a

5   landlord/tenant relationship with the same optometrists. These are the very

6   issues at interest in this litigation.

7        42.    The intended effort of AB 684 was to substantially change and

8   modify California Business and Professions Code sections 655 and 2556 by

9   introducing Assembly Bill 684 in the California State Assembly.   The

10  retailers were and are trying to legislatively get a "hall pass" on its illegal

11  conduct by having the Legislature stay enforcement of sections 655 and

12  2556.

13       43.    But the retailers' lobbying efforts fared no better than their

14  litigation strategy. The version of AB 684 that the eyewear retailers

15  introduced was extensively altered and scaled back extensively during the

16  Legislative process before being put to a final vote. In final form, rather than

17  repeal sections 655 and 2556, AB 684 actually *underscored* the very concerns

18  that motivated this and the other putative class actions pending before this

19  Court by putting express and meaningful separation between optical

20  retailers and the optometrists practicing out of retail locations.

21       44.    The heavily altered version of AB 684 subsequently passed both

22  the state senate and assembly and was approved by the Governor on

23  October 1, 2015. Attached hereto as Exhibit "B" is a true and correct copy of

24  the version of AB 684 that was passed by the California Legislature and

25  executed by the Governor.

26

27

28

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1296405v1   Case No.: 14cv00857 JAH (BLM)                Second Amended Complaint

1
2
3

**B.  Wal-Mart offered in-store eye examinations at their California retail locations from on-site optometrists who are subject to their indirect control and influence through their de facto agent, FirstSight, while falsely claiming that these optometrists were "Independent Doctors of Optometry."**

4   45.   The exact details of Defendants' scheme are held in secret, are

5   not disclosed to the public, and are therefore known only to them at this

6   juncture. Although Plaintiffs have not yet had the benefit of formal

7   discovery in this case, Plaintiffs' own informal investigation has revealed

8   the following details of Defendants' business model:

9   46.   At all times relevant to the complaint, Wal-Mart and FirstSight

10   operated under an agreement whereby Wal-Mart leases office spaces

11   immediately adjacent to the optical department in Wal-Mart retail locations

12   throughout California. The purpose of this lease agreement was to enable

13   FirstSight, as Wal-Mart's de facto agent, to sublease the space to California-

14   licensed optometrists for the purpose of conducting eye exams out of those

15   office locations. It was understood by Wal-Mart and FirstSight that

16   FirstSight would—by resort to various methods including enforcement

17   mechanisms built into the terms of the optometrists' subleases—maximize

18   the number of eye examinations that its subleasing optometrists would

19   perform. This, in turn, would maximize Wal-Mart's eyewear sales.

20   47.   Under this arrangement, FirstSight charges the tenant–

21   optometrists "rent" equal to a percentage of the optometrists' gross

22   revenues, which—for Wal-Mart optometrists—consists of fees collected for

23   exams.

24   48.   This arrangement is the perfect mechanism for Wal-Mart to

25   assert indirect control over its tenant–optometrists. Because FirstSight's

26   own profits are dependent on a high volume of eye examinations, FirstSight

27   has a built-in incentive to ensure that the tenant–optometrists in Wal-Mart

28   locations are performing a high volume of eye exams. And for Wal-Mart,

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 13 -

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

the resulting high volume of on-site eye examinations ensures a steady stream of customers in need of prescription eyewear.

49.    Thus, by giving FirstSight a vested interest in the tenant–optometrists' revenues, this scheme allows Wal-Mart to get FirstSight to do its "dirty work"—coercing optometrists to perform a high volume of eye exams—while Wal-Mart reaps the benefits of a high-volume exam practice generating prescriptions in its store. Thus, Wal-Mart optometrists were under pressure by FirstSight to do more exams because Wal-Mart makes more money when the optometrists write prescriptions.

50.    In accomplishment of this scheme, FirstSight signs individual lease agreements with the tenant–optometrists. Wal-Mart and FirstSight are too clever to state, in blackletter, that the individual optometrists are subject to the control and influence of either Wal-Mart or FirstSight, and thus anyone seeking to find such a clause in the *written* lease agreements between FirstSight and the individual tenant–optometrist would be deservedly disappointed.

51.    Rather, the aspects of Wal-Mart and FirstSight's control and influence over their tenant–optometrists arise in a variety of subtle, insidious ways that might be lost on a casual observer, but which become manifest when one considers the scheme as a whole:

52.    **One-year leases are terminable at FirstSight's will:**

52.1.    The leases between FirstSight and the tenant-optometrists are limited to a single year. After the year expires, the lease term can be renewed for another year at FirstSight's discretion.

52.2.    However, the leases also provide that FirstSight has the right to terminate the lease at **any time** for seemingly **any reason** with just 60 days written notice to the optometrist.  Moreover, the leases also provide that—during the pendency of the lease—FirstSight, in its sole discretion,

- 14 -

1   can change the office location the optometrist is practicing out of on just **one**

2   **week's** written notice.

3         52.3.   To the uninformed observer, the specter that a tenant–

4   optometrist may suddenly lose his or her lease for office space in a Wal-

5   Mart store, or be transferred to another store, may seem like an insignificant

6   consequence. But the reality is that optometry is a highly competitive,

7   highly saturated profession, and for many optometrists, establishing a

8   gainful, independent practice is a daunting task. Indeed, many optometrists

9   graduate from optometry school with significant student debt. And

10   opening a gainful optometry practice will require the optometrist to buy or

11   lease expensive diagnostic equipment, further compounding their debt.

12   This, of course, is not to mention salaries for staff members. And even then,

13   there is, of course, no guarantee that patients will come to such a practice

14   *even if* the optometrist spends still more money on advertising.

15         52.4.   Corporate retailers like Wal-Mart present a tempting port

16   in this storm by advertising fully equipped office spaces and a guaranteed

17   stream of customers/patients. It is thus no surprise that retail optometry

18   positions have become highly coveted positions within the optometry

19   profession.

20         52.5.   The ones who obtain such a lease are understandably

21   reluctant to lose it, and are therefore vulnerable and susceptible to trading

22   their professional independence where necessary to ensure their good

23   standing with Wal-Mart and FirstSight.

24         52.6.   Wal-Mart and FirstSight make the prospect of losing

25   one's lease even more daunting by embedding into it anti-competitive

26   provisions designed to ensure that if an optometrist leaves Wal-Mart, he or

27   she will take none of the goodwill they built with them and will thus have

28   to re-build their practices from scratch.

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1    52.7.    For example, the leases provide that while the lease is in

2    effect, and for one year thereafter, an optometrist cannot encourage his or

3    her patients to leave and follow the optometrist to another practice.

4    Moreover, the leases provide that while the lease is in effect, the only

5    telephone line that the optometrist may use to conduct business is one

6    provided and owned by FirstSight.

7    52.8.    Thus, an optometrist whose lease is not renewed cannot

8    notify his current patients that his practice is moving and encourage them

9    to join him at his new location. And, any patients who attempt to call the

10   optometrist—on the telephone number they are accustomed to reaching

11   him on—after he leaves, will instead reach FirstSight and be directed to the

12   optometrist's replacement.

13   53.    **FirstSight controls the optometrists' working hours:**

14   53.1.    Contrary to California's requirement that an

15   optometrist's practice "be owned by the optometrist and in every phase be

16   under his/her exclusive control," the lease agreements require the tenant-

17   optometrist to follow FirstSight's work schedule. The exact days and times

18   the optometrist must see patients are set forth in the lease and the

19   optometrist has no right to be on the premises for less time or more time

20   than what is provided in the lease.

21   53.2.    Moreover, the leases give FirstSight the unilateral right to

22   change those days and times upon just **one-week's notice** to the

23   optometrist—though the optometrist has no corresponding right to change

24   his or her work hours. According to the leases, the optometrist's failure to

25   obey FirstSight's schedule constitutes a "material breach" of the lease

26   agreements and thus is grounds for immediate termination of it.

27   53.3.    FirstSight's control over the optometrist's scheduling is

28   an overt way of ensuring that the tenant–optometrists have no choice but to

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 16 -

1  be onsite while the Wal-Mart optical department is open selling glasses. It
2  also forces an optometrist who wants to see as many patients as her or she
3  is able to spend less time with each patient because the optometrist cannot
4  be on the premises longer than dictated by the lease.

5      54.    **Optometrists have no control over fees they charge:**

6      54.1.   Contrary to California's requirement that an
7  optometrist's practice "be owned by the optometrist and in every phase be
8  under his/her exclusive control," the tenant-optometrists have no control
9  over the fees they charge.   The lease agreements provide that the
10 optometrist's fees must be competitive with those of other locations in the
11 area. Additionally, as revealed by a former FirstSight optometrist who
12 practiced out of a Wal-Mart store in Southern California during the class
13 period, FirstSight exercised even more precise control by dictating "exactly
14 what fees they [the optometrists] were allowed to charge."  When the
15 optometrist attempted to maintain higher fees, his lease was summarily
16 terminated. At all times during the class period, optometrists subleasing
17 space from FirstSight inside Wal-Mart locations charged identical exam fees
18 throughout California.

19     54.2.   FirstSight's ability to limit the fees the tenant-
20 optometrists can charge is another way for FirstSight to ensure that the
21 optometrists are maintaining a sufficiently high volume of exams, with a
22 resulting trickle-down effect on boosting Wal-Mart's eyewear sales. This is
23 because the lower FirstSight sets the exam fees, the less income a tenant-
24 optometrist can earn per exam and thus the more exams the optometrist
25 must perform in order to stay in business.

26     54.3.   Unfortunately, the reality of a high patient volume
27 coupled with limited hours during which the optometrists can be open for
28 business leads to abbreviated eye exams that are limited in scope.

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

55.   **Optometrists have no control over advertisements in their office space:**

55.1.   Contrary to California's requirement that an optometrist's practice "be owned by the optometrist and in every phase be under his/her exclusive control," the lease agreements preclude the tenant-optometrists from placing any signs or advertisements in their leased office space without the express consent of FirstSight, which may be given or withheld in FirstSight's sole discretion.

55.2.   Moreover, the lease agreements provide FirstSight with the right to install any signs it wishes—including signs that contain FirstSight's name—in any part of the optometrist's leased premises.

56.   **Optometrists have limited control over therapies they can recommend or provide and over referrals they can make:**

56.1.   Contrary to California's requirement that an optometrist's practice "be owned by the optometrist and in every phase be under his/her exclusive control," the tenant-optometrists have limited control over the treatments they can recommend to their patients.

56.2.   For instance, as revealed by a former FirstSight employee who worked for FirstSight during the class period, Wal-Mart management learned that one of the optometrists in a California Wal-Mart location was frequently prescribing eye medications on Wal-Mart's "four dollar list" (a list of medications sold by Wal-Mart pharmacies at very low prices) as opposed to similar, but more expensive medications the pharmacies sold. Wal-Mart management then told the optometrist that he must stop doing so because he was costing Wal-Mart money. The not-so-subtle message was, if you don't stop, your lease will not be renewed.

56.3.   Moreover, as revealed by a former FirstSight employee who worked as a high-ranking FirstSight executive during the class period,

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

First-Sight prohibits the optometrists who lease space inside California Wal-Mart stores from co-managing certain procedures, such as Lasik, that obviate the need for prescriptive eyewear. Though unlawful, such restrictions are a way for Wal-Mart to ensure that its customers will continue to be dependent on, and thus purchase, prescription eyewear (which, of course, Wal-Mart just so happens to sell immediately adjacent to the optometrist).

56.4.   Additionally, the lease agreements place restrictions on the optometrist's ability to refer patients to other optometrists.   For example, the lease agreements mandate that if a leasing optometrist wants to refer a patient to another optometrist for a second opinion, that optometrist **must be a FirstSight optometrist**.

57.   **Optometrists have limited control over staffing decisions:**

57.1.   Contrary to California's requirement that an optometrist's practice "be owned by the optometrist and in every phase be under his/her exclusive control," the lease agreements prohibit the tenant-optometrists from having another optometrist or staff member on the leased premises (e.g., to help him or her during particularly busy times of day) without obtaining FirstSight's written consent—which FirstSight may withhold for seemingly any reason.

57.2.   Moreover, the lease agreements require the optometrist to hire a staff person to staff the reception area at all times while the office is open.

58.   **Optometrists have limited control over their patients' records and day-to-day practice management:**

58.1.   Contrary to California's requirement that an optometrist's practice "be owned by the optometrist and in every phase be under his/her exclusive control," the leases provide that the tenant-

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 19 -

optometrists must turn over all patient medical records to FirstSight for storage and maintenance and to cede to FirstSight the duties regarding providing access to the medical records. Moreover, the leases provide that, for the majority of an optometrist's patients, FirstSight actually owns the patients' medical records.

58.2.    The leases also provide that the optometrist must use FirstSight's practice management system. This system dictates how the optometrist must manage his or her office, how the optometrist may collect payments for services rendered, and how the optometrist records his or her patient transactions. Additionally, the leases require the optometrist to populate FirstSight's patient database and to obtain patient signatures on all forms that FirstSight dictates—including patient informed consent forms.

59.    **Optometrists are audited to ensure conformity with quotas and satisfactory performance relative to other Wal-Mart optometrists:**

59.1.    As noted above, the tenant–optometrists promise to give FirstSight a percentage of the gross revenue the optometrists generate in operating their leased space. This gross revenue includes the revenues generated from exam fees and other professional services the optometrist renders in the leased office space.

59.2.    Aside from giving FirstSight—Wal-Mart's de facto agent—a vested financial interest in ensuring the optometrist sees as many patients as possible, this aspect of the lease also gives FirstSight a built-in method to assess the performance of each individual optometrists.

59.3.    For instance, the lease agreements require the optometrist to use FirstSight's practice management software which tracks each patient encounter and each financial transaction the optometrist enters into on the leased premises.

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

59.4.   Additionally, the optometrist is required to provide FirstSight with weekly reports concerning the amount of revenue he or she received each day during the preceding week.

59.5.   Further, the leases require the optometrist to maintain, on the premises, a permanent and accurate set of books and records of all revenues that he or she conducts at the business, and gives FirstSight the right to have internal and/or outside auditors audit these records **at any time for any reason**.

59.6.   The above data is compiled by FirstSight with data from optometrists in the region as well as state-wide, allowing FirstSight and Wal-Mart to assess an optometrist's performance relative to others' and to identify under-performing optometrists. Indeed, the lease agreements explicitly tell the optometrist that FirstSight may review the number of eye exams he or she performs in assessing the optometrist's performance. Of course, this performance is a key basis for FirstSight's and Wal-Mart's decision to terminate or renew the optometrist's lease.

59.7.   Optometrists who are deemed to be below the acceptable threshold are notified of that deficiency and are warned that continued failure to achieve the requisite standards will result in the termination of their lease. Optometrists who continue to fall short of expectations have their leases terminated and are promptly replaced by an optometrist who will then have his or her shot to toe Wal-Mart's corporate line.

60.   **Wal-Mart management is consulted before FirstSight renews leases with an optometrist:** Before renewing a lease, FirstSight solicits the input of Wal-Mart management regarding the tenant-optometrist's performance. This and other information confirms that Wal-Mart officials have a significant role in dictating whether a particular optometrist is terminated or retained, thus bolstering the already built-in incentive for

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 21 -

1   FirstSight to ensure that the location is staffed with a highly productive

2   optometrist who sees a high volume of patients.

3     61. **Optometrists are subject to inspection by FirstSight:** Contrary

4   to California's requirement that an optometrist's practice "be owned by the

5   optometrist and in every phase be under his/her exclusive control," the

6   leases provide that FirstSight can enter the tenant-optometrists' office at any

7   reasonable time to determine whether the optometrist is complying with all

8   terms of the lease.

9     62. In short, the aforementioned information regarding Defendants'

10  activities during the class period reveals that the lease agreements between

11  FirstSight and Wal-Mart's tenant–optometrists are not the typical arms-

12  length, garden-variety lease agreements between a landlord and a tenant.

13    63. Rather, the intent and effect of the lease is such that FirstSight—

14  and, thus, its de facto principal, Wal-Mart—plays an active role in

15  managing material aspects of the tenant–optometrists' day-to-day practices,

16  including, at a minimum, their hours of operation, the fees they charge,

17  services they advertise, therapies they offer, drugs they prescribe, referrals

18  they provide, the staffing of their offices, the scope and length of their

19  exams, and how they maintain patient health records and financial records.

20    64. Moreover, if the tenant–optometrist gives the slightest push

21  back or manifests any reluctance to do as told, FirstSight uses its ability to

22  terminate the lease at will upon sixty days' notice (and its ability to transfer

23  an optometrist to another store hundreds of miles away upon a mere

24  week's notice) and its onerous non-compete clauses as a cudgel to coerce

25  the tenant–optometrists back in line. Thus, the tenant–optometrists do their

26  best to toe the corporate line by churning out all the examinations they can,

27  because it is the only way to ensure FirstSight, acting as Wal-Mart's strong-

28  arm, won't pull their lease and take their patient base away, leaving the

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 22 -

1    optometrist without a livelihood.

2    **C.**   **Wal-Mart engages in fraudulent conduct by baiting customers into**
3    **its retail locations by falsely and misleadingly advertising the**
     **availability of eye examinations by "Independent Doctors of**
4    **Optometry."**

5         65.   In light of the cause-and-effect relationship between on-site eye
6    exams and increased eyewear sales, Wal-Mart lures customers into Wal-
7    Mart locations by advertising in various media, including on prominent
8    signs and displays throughout the Wal-Mart optical department, the
9    availability of eye examinations from "Independent Doctors of Optometry."

10        66.   The consistent and repeated emphasis on "Independent Doctors
11   of Optometry" is not accidental or immaterial. To the contrary, Wal-Mart
12   knows that the average consumer—including Plaintiffs and members of the
13   putative class—have a strong and justifiable preference for healthcare
14   providers whose examinations and treatment recommendations will be
15   determined solely by what is in the patient's best interest without outside
16   influence.

17        67.   Understandably, the average consumer would not entrust an
18   examination of their eyes to, or trust the treatment recommendations of, an
19   optometrist who is under the control and influence of a for-profit
20   corporation whose goal is to sell eyewear. Accordingly, the average
21   consumer would not pay for an examination of their eyes by an optometrist
22   whom they knew and understood to be under the control and influence of a
23   for-profit corporation whose goal is to sell eyewear.

24        68.   Wal-Mart knows that to the average consumer—including
25   Plaintiffs and members of the putative class—the phrase "Independent
26   Doctor of Optometry" fosters the impression that the optometrists treating
27   them are not operating under any duress or influence that would present a
28   conflict of interest in performing examinations and/or making treatment

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1   recommendations.

2   69.   Wal-Mart also knows that the average consumer—including

3   Plaintiffs and members of the putative class—would not purchase or

4   undergo an eye examination that is not being provided in conformity with

5   California law.

6   70.   Thus, to avoid this impediment to their business model, Wal-

7   Mart fails to disclose or conspicuously state that the optometrists working

8   out of Wal-Mart retail locations are, in fact, subject to Defendants' control

9   and influence. Nor do they disclose that its business model is illegal and

10  thus that the exams are being offered in violation of California law. To the

11  contrary, Defendants repeatedly, emphatically, and conspicuously

12  represent that the optometrists in Wal-Mart stores are "Independent

13  Doctors of Optometry."

14  71.   But, as discussed in the preceding paragraphs, the threshold

15  acts of locating optometrists in its stores, forming indirect landlord–tenant

16  relationships with them by and through its de facto agent FirstSight,

17  exerting control and influence over material aspects of the optometrists'

18  practices, and advertising the availability of on-site exams are all violations

19  of California law, a fact Defendants failed to disclose to Plaintiffs and

20  members of the putative class.

21  72.   Moreover, contrary to its deception by omission, the exams are

22  not being provided in conformity with California law.

23  73.   Moreover, contrary to its implied and/or express representation

24  that the exams are being provided by "Independent Doctors of Optometry,"

25  as discussed in considerable detail in the preceding paragraphs,

26  Defendants' tenant–optometrists are, by nature of the Defendants' scheme,

27  not independent and are instead subject to Defendants' control and

28  influence in material ways.

- 24 -

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

### SPECIFIC FACTUAL ALLEGATIONS

**A.    Plaintiff Omidi:**

74.    On or about June 27, 2012, Plaintiff Omidi visited the optical department at the Wal-Mart store located at 4840 Shawline Street in San Diego, California.

75.    Having seen Defendants' advertising in various forms in the public domain, including on prior trips to the store regarding the availability of onsite eye exams from an "Independent Doctor of Optometry," Plaintiff Omidi came to the store with the intent of purchasing an eye exam from an "Independent Doctor of Optometry" and, in fact, purchased an eye exam from the tenant–optometrist, Hoang Ho ("Ho"), for $58.

76.    Based on the unqualified representation that the exam would be performed by an "Independent Doctor of Optometry," and/or in the absence of any statements to the contrary, Plaintiff Omidi operated under the reasonable belief that the doctor on site was, in fact, a fully "Independent Doctor of Optometry."

77.    In fact, Ho—as with every other tenant–optometrist in Wal-Mart's stores throughout California—was a tenant of FirstSight/Wal-Mart under the same exact lease with FirstSight described earlier in this complaint and was thus operating under the same exact control and influence as the former Wal-Mart optometrists' whose experiences were related earlier in this complaint. As such, and in contradiction of the unqualified representation that Ho was an "Independent Doctor of Optometry," Ho was subject to Defendants' control and influence regarding material aspects of Ho's day-to-day practice, including, at a minimum, Ho's hours of operation, fees Ho charged, services Ho advertised, therapies Ho offered, drugs Ho prescribed, referrals Ho made, the length of Ho's exams,

1   the scope of Ho's exams, the staffing of Ho's office, and how Ho maintained

2   patient health records and financial records.

3      78.    Moreover, Ho's unfettered presence at or near the optical

4   department was itself an implied representation by Wal-Mart that Ho's

5   presence on-site was legal and that the exam was being provided in

6   conformity with California law.

7      79.    Plaintiff Omidi values her eye health and therefore would not

8   have sacrificed the integrity of her eye exam by paying for, or undergoing,

9   an exam from an optometrist who was not, in fact, an "Independent Doctor

10  of Optometry." For these same reasons, Plaintiff Omidi would not have

11  paid for or undergone an eye examination that was not legal for Defendants

12  to provide and thus not rendered in conformity with California law.

13     80.    Plaintiff Omidi thus would not have purchased an eye exam

14  from a Wal-Mart optometrist but for:

15        80.1.    Defendants' act of advertising the availability of eye

16  exams from "Independent Doctors of Optometry;"

17        80.2.    Defendants' nondisclosure of the fact that the

18  optometrists performing the exam were subject to Defendants' oversight

19  and control, and were thus not "Independent";

20        80.3.    Defendants' nondisclosure of the arrangement between

21  themselves, the aim and effect of which was to ensure that the optometrists

22  in Wal-Mart stores, including Ho, will see a high volume of patients and

23  meet the various quotas set not by the optometrists themselves in the

24  exercise of their professional judgment, but rather by Wal-Mart and

25  FirstSight.

26        80.4.    Defendants'    nondisclosure    and/or    implied

27  misrepresentation of the fact that the practice of offering onsite exams was

28  illegal;

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

81.     As a direct and proximate cause of Defendants' fraudulent and unfair business activity, Plaintiff Omidi "lost money" in the amount of at least $58 by paying for an exam from Wal-Mart's tenant–optometrist that she *would not* have purchased but for Defendants' misrepresentations and/or omissions detailed above.

**B.     Plaintiff Telleria:**

82.     On or about July 29, 2012, Plaintiff Telleria visited the optical department at the Wal-Mart store located at 75 North Broadway in Chula Vista, California.

83.     Having seen Defendants' advertising in various forms in the public domain, including on prior trips to the store regarding the availability of onsite eye exams from an "Independent Doctor of Optometry," Plaintiff Telleria came to the store with the intent of purchasing an eye exam from an "Independent Doctor of Optometry" and, in fact, purchased an eye exam from the tenant–optometrist, Raymundo Mendoza ("Mendoza"), for $58.

84.     Based on the unqualified representation that the exam would be performed by an "Independent Doctor of Optometry," and in the absence of any statements to the contrary, Plaintiff Telleria operated under the reasonable belief that the doctor on site was, in fact, a fully "Independent Doctor of Optometry."

85.     In fact, Mendoza—as with every other tenant–optometrist in Wal-Mart's stores throughout California—was a tenant of FirstSight/Wal-Mart under the same exact lease with FirstSight described earlier in this complaint and was thus operating under the same exact control and influence as the former Wal-Mart optometrists' whose experiences were related earlier in this complaint. As such, and in contradiction of the unqualified representation that Mendoza was an "Independent Doctor of

Optometry," Mendoza was subject to Defendants' control and influence regarding material aspects of Mendoza's day-to-day practice, including, at a minimum, Mendoza's hours of operation, fees Mendoza charged, services Mendoza advertised, therapies Mendoza offered, drugs Mendoza prescribed, referrals Mendoza made, the length of Mendoza's exams, the scope of Mendoza's exams, the staffing of Mendoza's office, and how Mendoza maintained patient health records and financial records.

86.   Moreover, Mendoza's unfettered presence at or near the optical department was itself an implied representation by Wal-Mart that Mendoza's presence on-site was legal and that the exam was being provided in conformity with California law.

87.   Plaintiff Telleria values her eye health and therefore would not have sacrificed the integrity of her eye exam by paying for, or undergoing, an exam from an optometrist who was not, in fact, an "Independent Doctor of Optometry." For these same reasons, Plaintiff Telleria would not have paid for or undergone an eye examination that was not legal for Defendants to provide and thus not rendered in conformity with California law.

88.   Plaintiff Telleria thus would not have purchased an eye exam from a Wal-Mart optometrist but for:

88.1.   Defendants' act of advertising the availability of eye examinations from an "Independent Doctor of Optometry";

88.2.   Defendants' nondisclosure of the fact that the optometrists performing the exam were subject to Defendants' oversight and control, and were thus not "Independent";

88.3.   Defendants' nondisclosure of the arrangement between themselves, the aim and effect of which was to ensure that the optometrists in Wal-Mart stores, including Mendoza, will see a high volume of patients and meet the various quotas set not by the optometrists themselves in the

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1    exercise of their professional judgment, but rather by Wal-Mart and

2    FirstSight.

3            88.4.   Defendants'   nondisclosure   and/or   implied

4    misrepresentation of the fact that the practice of offering onsite exams was

5    illegal;

6        89.   As a direct and proximate cause of Defendants' fraudulent and

7    unfair business activity, Plaintiff Telleria "lost money" in the amount of at

8    least $58 by paying for an exam from Wal-Mart's tenant–optometrist that

9    she *would not* have purchased but for Defendants' misrepresentations

10   and/or omissions detailed above.

11       90.   Defendants, by and through their conduct as described above,

12   engaged in, and/or aided and abetted, conduct the violated various

13   provisions of California law that exist to ensure the independence of

14   optometrists.[1] For example,:

15

16   _____

17   [1] While this complaint does not assert a cause of action under the

18   "Unlawful" prong of the UCL, allegations concerning Defendants' violation

     of California's laws regulating the independence of optometrists are

19   included because they are relevant to Defendants' misrepresentations in at

     least two ways. First, as the 9th Circuit has held, "because the California

20   legislature chose to regulate the independence of optometrists, and because

21   Costco allegedly marketed Costco-based optometrists as independent … we

22   can only conclude that the independence of the optometrist was a material

     part of DeCarlo's bargain." *DeCarlo v. Costco Wholesale Corp.*, No. 16-56602,

23   2018 U.S. App. LEXIS 21205, at *4 (9th Cir. July 31, 2018) (citing *Kwikset v.*

24   *Superior Court*, 246 P.3d 877 (Cal. 2011)). Second, as explained herein,

     Defendants failed to disclose to Plaintiffs and the purported class that the

25   exams were *not* being performed in conformity with California law and,

26   instead, Defendants impliedly represented that the exams were legal. Had

27   Defendants disclosed the illegality of the exams to Plaintiffs and the

28   purported class, they would not have purchased the exams.

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1296405v1    Case No.: 14cv00857 JAH (BLM)    Second Amended Complaint

90.1.   Defendants violated, and/or aided and abetted the violation of, Business and Professions Code § 655 by, directly or indirectly, forming a landlord–tenant relationship between Wal-Mart, a registered dispensing optician, and optometrists (including Ho and Mendoza) under which optometrists directly or indirectly lease office space within Wal-Mart locations, by and through FirstSight, for the purpose of providing onsite eye exams;

90.2.   Defendants violated, and/or aided and abetted the violation of, Business and Professions Code § 655 by, directly or indirectly, forming a profit-sharing relationship between Wal-Mart, a registered dispensing optician and optometrists (including Ho and Mendoza), under which optometrists shared a significant portion of their profits with FirstSight, which in turn shared a portion of those profits with Wal-Mart;

90.3.   Defendants violated, and/or aided and abetted the violation of, Business and Professions Code § 2556 by, directly or indirectly "maintaining" optometrists (including Ho and Mendoza) at Wal-Mart locations in California for purposes of providing on-site examinations to Wal-Mart customers;

90.4.   Defendants violated, and/or aided and abetted the violation of, Business and Professions Code §§ 3040 and 3041, by directly or indirectly, asserting control over material aspects of their tenant–optometrists' practices, thus constituting the unlicensed practice of optometry;

90.5.   Defendants violated, and/or aided and abetted the violation of, title 16, section 1399.251, of the California Code of Regulations by advertising in various public domains, including on signs in Wal-Mart locations, the on-site availability eye exams by an optometrist; and

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

90.6.   Defendants violated, and/or aided and abetted the violation of, title 16, section 1514, of the California Code of Regulations by causing its tenant–optometrists (including Ho and Mendoza) to cede material aspects of their practice to Defendants' control and influence.

91.   As a combined and overlapping consequence of Defendants' aforementioned actions, Defendants fostered an environment at Wal-Mart locations throughout California.

92.   The optometrists, as tenants of Defendants, were subject to the direct or indirect control and influence of Wal-Mart, a registered dispensing optician, by and through its de facto agent, FirstSight, regarding material aspects of the tenant–optometrists' day-to-day practices, including, at a minimum, their hours of operation, the fees they charge, services they advertise, therapies they offer, drugs they prescribe, referrals they provide, the staffing of their offices, the scope and length of their exams, and how they maintain patient health records and financial records;

92.1.   Customers were lured into Wal-Mart locations to undergo eye exams through the use of misleading advertisements regarding the availability of on-site examinations from "Independent Doctors of Optometry."

93.   Plaintiffs and members of the putative class would not have purchased an eye exam from a Wal-Mart optometrist but for:

93.1.   Defendants' act of advertising the availability of eye examinations from an "Independent Doctor of Optometry;"

94.   Defendants' nondisclosure of the fact that the optometrists performing the exams were subject to Defendants oversight and control regarding material aspects of the tenant–optometrists' day-to-day practices, including, at a minimum, their hours of operation, the fees they charge, services they advertise, therapies they offer, drugs they prescribe, referrals

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1  they provide, the staffing of their offices, the scope and length of their

2  exams, and how they maintain patient health records and financial records,

3  and were thus not "Independent";

4       95.     Defendants' misrepresentation of the fact that the optometrist

5  performing the exams were "Independent" when, in fact, the optometrist

6  performing the exams were subject to Defendants' direct or indirect control

7  and influence regarding material aspects of the tenant–optometrists' day-to-

8  day practices, including, at a minimum, their hours of operation, the fees

9  they charge, services they advertise, therapies they offer, drugs they

10  prescribe, referrals they provide, the staffing of their offices, the scope and

11  length of their exams, and how they maintain patient health records and

12  financial records;

13       95.1.    Defendants' nondisclosure of the fact that the onsite

14  exams it offered were illegal and/or implied misrepresentation that the

15  exams were legal.

16

17                          FIRST CAUSE OF ACTION
          Violation of California's Unfair Competition Law (Bus. & Prof. Code,
18                § 17200) for "Fraudulent" Business Practices
                           (Against All Defendants)
19

20       96.     Plaintiffs incorporate herein each and every allegation set forth

21  in the preceding paragraphs as though fully set forth herein.

22       97.     Defendants engaged in, or aided and abetted in the commission

23  of, "fraudulent" business practices by deceiving members of the public,

24  including Plaintiffs and members of the putative class by:

25       98.     Misrepresenting that the doctors of optometry practicing out of

26  Wal-Mart locations were "Independent Doctors of Optometry," when in

27  fact they were subject to Defendants' control and influence regarding

28  material aspects of the tenant–optometrists' day-to-day practices, including,

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

at a minimum, their hours of operation, the fees they charge, services they advertise, therapies they offer, drugs they prescribe, referrals they provide, the staffing of their offices, the scope and length of their exams, and how they maintain patient health records and financial records;

99.   Failing to disclose that the doctors performing the exams were subject to Defendants' control and influence regarding material aspects of the tenant–optometrists' day-to-day practices, including, at a minimum, their hours of operation, the fees they charge, services they advertise, therapies they offer, drugs they prescribe, referrals they provide, the staffing of their offices, the scope and length of their exams, and how they maintain patient health records and financial records.

99.1.   Failing to disclose the material fact that the exams available at Wal-Mart locations were not being offered in conformity with the laws of the State of California;

100.   Each of these representations was false or misleading and made with knowledge that it was false or misleading. Indeed, as matter of policy, Wal-Mart and FirstSight exerted their influence and control over their tenant–optometrists and, as alleged above, coerced their tenant–optometrists to undertake efforts that are in Defendants' business interests, and are inconsistent with the aforementioned representations.

101.   Cognizant that the average consumer would be dissuaded by indications that the exams would be performed by optometrists beholden to Defendants, Defendants intended for Plaintiffs and members of the class to rely on these representations in an effort to lure them to Wal-Mart stores for eye examinations, and therefore used language in Wal-Mart's signs and other publically available advertising—namely, the unqualified representation that the exams would be performed by an "Independent Doctor of Optometry"—to appeal to consumers' preference for unbiased,

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1   independent healthcare providers whose professional services will be
2   rendered without conflicts of interest.

3       102.   Defendants' conduct was likely to, and did deceive, the people
4   of the State of California and the general public regarding, among other
5   things, the independence of the optometrists performing eye exams at Wal-
6   Mart locations as well as the legality of the exam they purchased.

7       103.   The misrepresentations and omissions concerned material
8   information, namely the independence of the healthcare provider providing
9   their medical examination and the exam's conformity with the laws and
10  regulations governing the practice of optometry in California. The
11  materiality of these facts is apparent from Defendants' emphasis on the
12  purported independence of optometrists in advertising to members of the
13  public, the fact that had Plaintiffs and members of the class known the truth
14  about these facts, they would not have purchased the exams, and the fact
15  that California's legislature chose to regulate the independence of
16  optometrists.

17      104.   The nondisclosed facts—that the doctors performing the exams
18  were *not* independent and the fact that the exams were not being offered in
19  conformity with California law—are actionable insofar as the facts were
20  exclusively known to Defendants and/or needed to be related to Plaintiffs
21  and members of the class to cure the misleading nature of the information
22  Defendants' *did* convey. Moreover, insofar as Defendants attempted to
23  engage in the unlicensed practice of optometry by controlling material
24  aspects of their tenant–optometrists' practices, they are saddled with, and
25  are estopped from denying the existence of, a fiduciary obligation to
26  volunteer material information to prospective patients including Plaintiffs
27  and members of the class.

28

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1296405v1   Case No.: 14cv00857 JAH (BLM)                 Second Amended Complaint

1    105.   Plaintiffs and members of the class reasonably relied on these

2    representations in choosing to come to Wal-Mart locations to have their

3    eyes examined and prescriptions written by optometrists in those stores.

4    106.   Plaintiffs and members of the putative class have lost money as

5    a   direct   and   proximate   result   of   Defendants'   aforementioned

6    misrepresentations and other wrongful conduct in the form of fees for

7    examinations which the putative class members would not have purchased

8    had they known about the truth about the exams.

9    107.   To the extent they did not themselves engage in wrongful

10   conduct directly, Defendants—and each of them—aided and abetted,

11   encouraged and rendered substantial assistance in accomplishing the

12   wrongful conduct and their wrongful goals and other wrongdoing

13   complained of herein. In taking actions to aid and abet and substantially

14   assist the commission of these wrongful acts and other wrongdoings

15   complained of, Defendants acted with an awareness of the primary

16   wrongdoing and realized the conduct would substantially assist the

17   accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

18
19
20

<div align="center">

SECOND CAUSE OF ACTION
**Violation of California's Unfair Competition Law (Bus. & Prof. Code,
§ 17200) for "Unfair" Business Practices**
(Against All Defendants)

</div>

21   108.   Plaintiffs incorporate herein each and every allegation set forth

22   in the preceding paragraphs as though fully set forth herein.

23   109.   As alleged above, California law maintains a strong public

24   policy against the corporate practice of medicine, and has enacted

25   numerous laws and regulations in an effort to ban the myriad and ever-

26   evolving ways eyewear retailers will attempt to assert influence and control

27   over healthcare providers in an effort to enhance their marketing efforts.

28

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

110.  As alleged herein, Defendants formed and executed a plan to violate California law by locating optometrists in Wal-Mart stores for the purpose of offering onsite examinations, devising insidious ways to erode the tenant–optometrists' independence by asserting control and influence over material aspects of their practice, by misrepresenting that the exams would be performed by "Independent Doctors of Optometry" when in fact the optometrists providers were tenants subject to Defendants' control and influence, by misrepresenting the legality of the practice to the general public, and/or by aiding and abetting in the commission of the above.

111.  As noted above, FirstSight, for sake of Wal-Mart's eyewear sales, would frequently deter tenant–optometrists from offering therapeutic services to their patients where those services might have the ultimate effect of diminishing the patients' reliance on corrective lenses.

112.  That Defendants would conspire to violate California's long-standing policy against the corporate practice of medicine and knowingly deceive unsuspecting consumers into undergoing medical examinations by doctors with a manifest conflict of interest who are subject to Defendants' interests in maximizing profits, is outrageous, highly offensive to established public policy as expressed in legislative enactments, and would be condemned as despicable and immoral by the public at large.

113.  Defendants' conduct cannot be justified by any conceivable legitimate purpose other than a reckless and greedy thirst for profit. Defendants might try to justify their business practices as beneficial to the consumer due to the convenience of one-stop optical shopping. And, indeed, this perception of convenience—and the public's lack of awareness regarding the influence over the "Independent Doctors of Optometry" prescribing their eyewear by the company selling it—is undoubtedly the reason why this practice remains highly profitable.

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

114.  This is not to mention that California's laws and regulations banning the corporate oversight of medicine in general and optometry in particular reflect the Legislature's recognition that convenience is not a sufficient trade-off for the physical welfare of California citizens. It also reflects the Legislature's recognition that, because consumers are all too easily tempted by convenience and unaware of the hazards inherent in one-stop shopping, the free market is not a sufficient mechanism to curb the corporate practice of medicine.

115.  Accordingly, Defendants have engaged in "unfair" business practices in violation of Business and Professions Code § 17200.

116.  Plaintiffs and members of the putative class have lost money as a direct and proximate result of Defendants' aforementioned misrepresentations and other wrongful conduct in the form of fees for examinations which Plaintiffs and the putative class members would not have purchased had they known about the truth about the exams.

117.  To the extent they did not themselves engage in wrongful conduct directly, Defendants—and each of them—aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein. In taking actions to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, Defendants acted with an awareness of the primary wrongdoing and realized the conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1296405v1          Case No.: 14cv00857 JAH (BLM)          Second Amended Complaint

**THIRD CAUSE OF ACTION**
**Violation of California's False Advertising Law**
**(Bus. & Prof. Code, § 17500)**
(Against All Defendants)

118. Defendants disseminated, or aided and abetted in the dissemination of, "fraudulent" advertising by making material false, deceptive, or misleading statements to members of the public, including Plaintiffs and members of the putative class, including:

119. Misrepresenting that the doctors of optometry practicing out of Wal-Mart locations were "Independent Doctors of Optometry," when in fact they were subject to Defendants' control and influence regarding material aspects of the tenant–optometrists' day-to-day practices, including, at a minimum, their hours of operation, the fees they charge, services they advertise, therapies they offer, drugs they prescribe, referrals they provide, the staffing of their offices, the scope and length of their exams, and how they maintain patient health records and financial records;

120. Issuing misleading advertising insofar as it failed to disclose that the doctors performing the exams were subject to Defendants' control and influence regarding material aspects of the tenant–optometrists' day-to-day practices, including, at a minimum, their hours of operation, the fees they charge, services they advertise, therapies they offer, drugs they prescribe, referrals they provide, the staffing of their offices, the scope and length of their exams, and how they maintain patient health records and financial records.

120.1. Issuing misleading advertising insofar as it failed to disclose the material fact that the exams available at Wal-Mart locations were not being offered in conformity with the laws of the State of California;

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

121.   Each of these representations was false or misleading and made with knowledge that it was false or misleading. Indeed, as matter of policy, Wal-Mart and FirstSight exerted their influence and control over their tenant–optometrists and, as alleged above, coerced their tenant–optometrists to undertake efforts that are in Defendants' business interests, and are inconsistent with the aforementioned representations.

122.   Cognizant that the average consumer would be dissuaded by indications that the exams would be performed by optometrists beholden to Defendants, Defendants intended for Plaintiffs and members of the class to rely on these representations in an effort to lure them to Wal-Mart stores for eye examinations, and therefore used language in Wal-Mart's publically available advertisements, including in-store signs—namely, the unqualified representation that the exams would be performed by an "Independent Doctor of Optometry"—to appeal to consumers' preference for unbiased, independent healthcare providers whose professional services will be rendered without conflicts of interest.

123.   Defendants' conduct was likely to, and did deceive, the people of the State of California and the general public regarding, among other things, the independence of the optometrists performing eye exams at Wal-Mart locations as well as the legality of the exam they purchased.

124.   The misrepresentations and omissions concerned material information, namely the independence of the healthcare provider providing their medical examination and the exam's conformity with the laws and regulations governing the practice of optometry in California. The materiality of these facts is apparent from Defendants' emphasis on the purported independence of optometrists in advertising to members of the public, the fact that Plaintiffs and members of the class known the truth about these facts, they would not have purchased the exams, and the fact

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1   that California's legislature chose to regulate the independence of
2   optometrists.

3       125.   The nondisclosed facts—that the doctors performing the exams
4   were *not* independent and the fact that the exams were not being offered in
5   conformity with California law—are actionable insofar as the facts were
6   exclusively known to Defendants and/or needed to be related to Plaintiffs
7   and members of the class to cure the misleading nature of the information
8   Defendants' *did* convey. Moreover, insofar as Defendants attempted to
9   engage in the unlicensed practice of optometry by controlling material
10  aspects of their tenant–optometrists' practices, they are saddled with, and
11  are estopped from denying the existence of, a fiduciary obligation to
12  volunteer material information to prospective patients including Plaintiffs
13  and members of the class.

14      126.   Plaintiffs and members of the class reasonably relied on these
15  representations in choosing to come to Wal-Mart locations to have their
16  eyes examined and prescriptions written by optometrists in those stores.

17      127.   Plaintiffs and members of the putative class have lost money as
18  a   direct   and   proximate   result   of   Defendants'   aforementioned
19  misrepresentations and other wrongful conduct in the form of fees for
20  examinations which Plaintiffs and the putative class members would not
21  have purchased had they known about the truth about the exams.

22      128.   To the extent they did not themselves engage in wrongful
23  conduct directly, Defendants—and each of them—aided and abetted,
24  encouraged and rendered substantial assistance in accomplishing the
25  wrongful conduct and their wrongful goals and other wrongdoing
26  complained of herein. In taking actions to aid and abet and substantially
27  assist the commission of these wrongful acts and other wrongdoings
28  complained of, Defendants acted with an awareness of the primary

THORSNES BARTOLOTTA McGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1 wrongdoing and realized the conduct would substantially assist the

2 accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

3

### FOURTH CAUSE OF ACTION
**Violation of California's Consumer Legal Remedies Act**
**(Civ. Code, § 1750, et. seq.)**
(Against Wal-Mart Only)

6 129.   Plaintiffs incorporate herein each and every allegation set forth

7 in the preceding paragraphs as though fully set forth herein.

8 130.   Consumer Legal Remedies Act ("CLRA"), codified at California

9 Civil Code § 1750, et seq., was designed to protect consumers from unfair

10 and deceptive business practices. To that end, the CLRA sets forth a list of

11 unfair and deceptive business acts and practices that are specifically

12 prohibited in any transaction intended to result in the sale or lease of goods

13 or services to a consumer.

14 131.   Defendants are "persons" within the meaning of Civil Code

15 § 1770 and § 1761(c). Furthermore, Defendants sell "goods" and "services

16 within the meaning of Civil Code § 1770 and § 1761(a)–(b).

17 132.   Plaintiffs and members of the class were, at all relevant times,

18 "consumers" within the meaning of Civil Code § 1761(d).

19 133.   The purchase of eye examinations from Defendants constitutes a

20 transaction within the meaning of Civil Code § 1770 and § 1761(e).

21 134.   Defendants violated the CLRA in the following ways:

22 135.   By "[p]assing off the goods or services as those of another," in

23 violation of Civil Code § 1770(a)(1), when they represented to consumers

24 that the eye exams available in Wal-Mart locations would be provided

25 exclusively by "Independent Doctors of Optometry" when in fact they were

26 provided by optometrists who were subject to Defendants' control and

27 influence regarding material aspects of the tenant–optometrists' day-to-day

28 practices, including, at a minimum, their hours of operation, the fees they

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 41 -

1    charge, services they advertise, therapies they offer, drugs they prescribe,
2    referrals they provide, the staffing of their offices, the scope and length of
3    their exams, and how they maintain patient health records and financial
4    records.

5        136.   By "[r]epresenting that . . . services are of a particular standard .
6    . . if they are of another," in violation of Civil Code § 1770(a)(7), by
7    representing to consumers that the eye exams would be provided
8    exclusively by "Independent Doctors of Optometry" when in fact they were
9    provided by optometrists who were subject to Defendants' control and
10   influence regarding material aspects of the tenant–optometrists' day-to-day
11   practices, including, at a minimum, their hours of operation, the fees they
12   charge, services they advertise, therapies they offer, drugs they prescribe,
13   referrals they provide, the staffing of their offices, the scope and length of
14   their exams, and how they maintain patient health records and financial
15   records.

16       137.   By "[a]dvertising . . . services with an intent not to sell them as
17   advertised," in violation of Civil Code § 1770(a)(9), by representing to
18   consumers that the eye exams would be provided exclusively by
19   "Independent Doctors of Optometry" when in fact they were provided by
20   optometrists who were subject to Defendants' control and influence
21   regarding material aspects of the tenant–optometrists' day-to-day practices,
22   including, at a minimum, their hours of operation, the fees they charge,
23   services they advertise, therapies they offer, drugs they prescribe, referrals
24   they provide, the staffing of their offices, the scope and length of their
25   exams, and how they maintain patient health records and financial records.

26       138.   Plaintiffs and members of the class were and are direct victims
27   of Defendants' "false" advertising in violation of Civil Code § 1770 as
28   described above, by virtue of having paid for what they believed would be

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

- 42 -

1   a legal exam from an "Independent Doctor of Optometry," when neither
2   was true.

3       139.   Plaintiffs and members of the putative class have lost money as
4   a   direct   and   proximate   result   of   Defendants'   aforementioned
5   misrepresentations and other wrongful conduct in the form of fees for
6   examinations which Plaintiffs and the putative class members would not
7   have purchased had they known the truth about the exams.

8       140.   To the extent they did not themselves engage in wrongful
9   conduct directly, Defendants—and each of them—aided and abetted,
10  encouraged, personally participated in, and rendered substantial assistance
11  in accomplishing the wrongful conduct and their wrongful goals and other
12  wrongdoing complained of herein. In taking actions to aid and abet and
13  substantially   assist   the   commission   of   these   wrongful   acts   and   other
14  wrongdoings complained of, Defendants acted with an awareness of the
15  primary wrongdoing and realized the conduct would substantially assist
16  the   accomplishment   of   the   wrongful   conduct,   wrongful   goals,   and
17  wrongdoing.

18      141.   On September 26, 2013, and in the manner set forth in Civil
19  Code   § 1782(a)(2),   Plaintiff   Omidi   notified   Defendants   of   the
20  aforementioned   violations   of   the   CLRA   and   demanded   they   take
21  appropriate corrective measures to ameliorate the violations. As of the filing
22  of this complaint, Defendants have failed to take any corrective measures.
23  Accordingly, pursuant to Civil Code § 1780(1), Plaintiffs and the class seek
24  the following remedies:

25      141.1.   An order of this Court enjoining Defendants from
26  engaging in the methods, acts, and/or practices alleged herein, as provided
27  under Civil Code section 1780(a)(2);

28

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

Case No.: 14cv00857 JAH (BLM)       Second Amended Complaint

1    141.2. Actual damages, as provided under Civil Code
2    § 1780(a)(1);

3    141.3. Restitution of property, as provided under Civil Code
4    § 1780(a)(3);

5    141.4. Statutory damages under Civil Code § 1780, where
6    applicable; and

7    141.5. Punitive damages, as provided under Civil Code
8    § 1780(a)(4).

9    **PRAYER FOR RELIEF**

10   Wherefore, Plaintiffs pray that this action be certified as a class, that
11   Plaintiffs be designated as the class representatives, that their counsel be
12   designated as class counsel, and that judgment be entered against
13   Defendants, and each of them, jointly and severally, as follows:

14   1.    For compensatory damages, including actual damages,
15   according to proof, where applicable;

16   2.    Restitution of the exam fees paid by the members of the class in
17   an amount to be determined and proven at time of trial;

18   3.    For disgorgement of any and all monies Defendants received as
19   a result of the misconduct complained of herein in an amount to be
20   determined and proven at time of trial;

21   4.    For statutory penalties, where applicable;

22   5.    For punitive damages, where applicable;

23   6.    For attorneys' fees incurred in the investigation and prosecution
24   of this suit, where applicable;

25   7.    For the costs of litigation and investigation associated with this
26   suit;

27   8.    For pre-judgment interest at the maximum legal rate on all sums
28   awarded;

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1296405v1

1    9.    For appointment of a receiver; and

2    10.   For such other relief as the Court deems just and proper.

3                           **REQUEST FOR JURY TRIAL**

4         Plaintiffs request a jury trial on all causes of actions for which the

5    right to a jury exists under applicable state or federal law.

6

7    Dated: October 22, 2018          THORSNES BARTOLOTTA MCGUIRE LLP

8

9                               By:   s/ Jarrett S. Charo
                                      _____
10                                    Jarrett S. Charo
                                      charo@tbmlawyers.com

11                                    Attorneys for Plaintiffs MOJDEH OMIDI
                                      AND AURORA TELLERIA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 14cv00857 JAH (BLM)                    Second Amended Complaint

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

1296405v1

## Index of Exhibits

| Exhibit | Document | Page Number |
|---|---|---|
| A | Assembly Bill No. 684. Introduced by Assembly Member Bonilla, February 25, 2015 | Exh A047-A050 |
| B | Assembly Bill No. 684, Chapter 405 | Exh B051-B064 |

THORSNES BARTOLOTTA MCGUIRE
2550 FIFTH AVENUE, 11TH FLOOR
SAN DIEGO, CALIFORNIA 92103
TEL: (619) 236-9363
FAX: (619) 236-9653

# EXHIBIT A

Exh A047

CALIFORNIA LEGISLATURE—2015–16 REGULAR SESSION

## ASSEMBLY BILL                                          No. 684

### Introduced by Assembly Member Bonilla

### February 25, 2015

An act to amend Section 4200.3 of the Business and Professions Code, relating to healing arts.

LEGISLATIVE COUNSEL'S DIGEST

AB 684, as introduced, Bonilla. Pharmacy.

Existing law, the Pharmacy Law, provides for the licensure and regulation of pharmacists by the California State Board of Pharmacy within the Department of Consumer Affairs. Existing law authorizes the board to license as a pharmacist an applicant who meets specified requirements, including passage of the North American Pharmacist Licensure Examination. Existing law requires the examination process to meet specified standards and federal guidelines and requires the board to terminate use of that examination if the department determines that the examination fails to meet those standards. Existing law requires the board to report to the now obsolete Joint Committee on Boards, Commissions, and Consumer Protection and the department specified examination pass rate information.

This bill would instead require the board to report that pass rate information to the appropriate policy committees of the Legislature and the department. The bill would also make nonsubstantive changes to those provisions.

Vote: majority.   Appropriation:   no.   Fiscal committee:   yes. State-mandated local program:   no.

99

Exh A048

AB 684                     — 2 —

*The people of the State of California do enact as follows:*

1    SECTION 1.   Section 4200.3 of the Business and Professions
2    Code is amended to read:
3    4200.3.   (a)   The examination process shall be regularly
4    reviewed pursuant to Section 139.
5    (b)   The examination process shall meet the standards and
6    guidelines set forth in the Standards for Educational and
7    Psychological Testing and the ~~Federal~~ *federal* Uniform Guidelines
8    ~~for~~ *on* Employee Selection Procedures. The board shall work with
9    the Office of Professional Examination Services of the department
10   or with an equivalent organization who shall certify at minimum
11   once every five years that the examination process meets these
12   national testing standards. If the department determines that the
13   examination process fails to meet these standards, the board shall
14   terminate its use of the North American ~~Pharmacy~~ *Pharmacist*
15   Licensure Examination and shall use only the written and practical
16   examination developed by the board.
17   (c)   The examination shall meet the mandates of subdivision (a)
18   of Section 12944 of the Government Code.
19   (d)   The board shall work with the Office of Professional
20   Examination Services or with an equivalent organization to develop
21   the state jurisprudence examination to ensure that applicants for
22   licensure are evaluated on their knowledge of applicable state laws
23   and regulations.
24   (e)   The board shall annually publish the pass and fail rates for
25   the pharmacist's licensure examination administered pursuant to
26   Section 4200, including a comparison of historical pass and fail
27   rates before utilization of the North American Pharmacist Licensure
28   Examination.
29   (f) *(1)*   The board shall report to the ~~Joint Committee on Boards,~~
30   ~~Commissions, and Consumer Protection~~ *appropriate policy*
31   *committees of the Legislature* and the department as part of its
32   next scheduled review, the pass rates of applicants who sat for the
33   national examination compared with the pass rates of applicants
34   who sat for the prior state examination. This report shall be a
35   component of the evaluation of the examination process that is
36   based on psychometrically sound principles for establishing
37   minimum qualifications and levels of competency.

99

Exh A049

— 3 —                              AB 684

1      (2)  This subdivision shall become inoperative on January 1,
2   2020, pursuant to Section 10231.5 of the Government Code.

O

99

Exh A050

# EXHIBIT B

AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

### Assembly Bill No. 684

### CHAPTER 405

An act to amend Sections 2546.2, 2546.9, 2550.1, 2554, 2556, 2567, 3010.5, 3011, 3013 of, to add Sections 2556.1, 2556.2, 3020, 3021, 3023.1 to, and to repeal and add Section 655 of, the Business and Professions Code, relating to healing arts.

[Approved by Governor October 1, 2015. Filed with
Secretary of State October 1, 2015.]

LEGISLATIVE COUNSEL'S DIGEST

AB 684, Alejo. State Board of Optometry: optometrists: nonresident contact lens sellers: registered dispensing opticians.

Existing law prohibits a licensed optometrist and a registered dispensing optician from having any membership, proprietary interest, coownership, landlord-tenant relationship, or any profit-sharing arrangement in any form, directly or indirectly, with each other. Existing law prohibits a licensed optometrist from having any membership, proprietary interest, coownership, landlord-tenant relationship, or any profit-sharing arrangement in any form, directly or indirectly, either by stock ownership, interlocking directors, trusteeship, mortgage, trust deed, or otherwise with any person who is engaged in the manufacture, sale, or distribution to physicians and surgeons, optometrists, or dispensing opticians of lenses, frames, optical supplies, optometric appliances or devices or kindred products. Existing law makes a violation of these provisions by a licensed optometrist and any other persons, whether or not a healing arts licensee, who participates with a licensed optometrist, subject to a crime.

Under existing law, the Medical Board of California is responsible for the registration and regulation of nonresident contact lens sellers and dispensing opticians. Existing law requires fees collected from nonresident contact lens sellers to be deposited in the Dispensing Opticians Fund, and to be available, upon appropriation, to the Medical Board of California. Existing law requires fees collected from registered dispensing optician to be paid into the Contingent Fund of the Medical Board of California. Existing law makes a violation of the registered dispensing optician provisions a crime. Existing law, the Optometry Practice Act, makes the State Board of Optometry responsible for the licensure and regulation of optometrists. A violation of the Optometry Practice Act is a crime. Existing law, the Knox-Keene Health Care Service Plan Act of 1975, provides for the licensure and regulation of health care service plans by the Department of Managed Health Care and makes a willful violation of the act a crime.

This bill would repeal those prohibitions. The bill would prohibit a licensed optometrist from having any membership, proprietary interest,

91

Exh B052

coownership, or any profit-sharing arrangement, either by stock ownership, interlocking directors, trusteeship, mortgage, or trust deed, with any registered dispensing optician or any optical company, as defined, except as otherwise authorized. The bill would authorize a registered dispensing optician or optical company to operate, own, or have an ownership interest in a health plan, defined as a licensed health care service plan, if the health plan does not directly employ optometrists to provide optometric services directly to enrollees of the health plan, and would also provide for the direct or indirect provision of products and services to the health plan or its contracted providers or enrollees or to other optometrists, as specified. The bill would authorize an optometrist, a registered dispensing optician, an optical company, or a health plan to execute a lease or other written agreement giving rise to a direct or indirect landlord-tenant relationship with an optometrist if specified conditions are contained in a written agreement, as provided. The bill would authorize the State Board of Optometry, to inspect, upon request, an individual lease agreement, and the bill would require the landlord or tenant to comply. Because the failure to comply with that request would be a crime under specified acts, the bill would impose a state-mandated local program. The bill would prohibit a registered dispensing optician from having any membership, proprietary interest, coownership, or profit sharing arrangement either by stock ownership, interlocking directors, trusteeship, mortgage, or trust deed, with an optometrist, except as authorized. The bill would make a violation of these provisions a crime. By creating a new crime, the bill would impose a state-mandated local program.

This bill would instead make the State Board of Optometry responsible for the registration and regulation of nonresident contact lens sellers and dispensing opticians. The bill would direct fees collected from registered dispensing opticians and persons seeking registration as a dispensing optician to be paid into the Dispensing Opticians Fund, and to be available, upon appropriation, to the State Board of Optometry. The bill would make various conforming changes in that regard.

Existing law requires each registered dispensing optician to conspicuously and prominently display at each registered location the name of the registrant's employee who is currently designated to handle customer inquiries and complaints and the telephone number where he or she may be reached during business hours.

This bill would instead require specified consumer information to be displayed. Because a violation of the registered dispensing provisions would be a crime, the bill would impose a state-mandated local program.

Existing law makes it unlawful to, among other things, advertise the furnishing of, or to furnish, the services of a refractionist, an optometrist, or a physician and surgeon, or to directly or indirectly employ or maintain on or near the premises used for optical dispensing, a refractionist, an optometrist, a physician and surgeon, or a practitioner of any other profession for the purpose of any examination or treatment of the eyes.

91

Exh B053

This bill, except as specified, would make it unlawful for a registered dispensing optician to, among other things, advertise the furnishing of, or to furnish, the services of an optometrist or a physician and surgeon or to directly employ an optometrist or physician and surgeon for the purpose of any examination or treatment of the eyes. The bill would authorize the State Board of Optometry, by regulation, to impose and issue administrative fines and citations for a violation of these provisions, as specified. The bill would require all licensed optometrists in a setting with a registered dispensing optician to report the business relationship to the State Board of Optometry. The bill would authorize the State Board of Optometry to inspect any premises at which the business of a registered dispensing optician is co-located with the practice of an optometrist for the purposes of determining compliance with the aforementioned written lease agreement provisions. The bill would also authorize the State Board of Optometry to take disciplinary action against a party who fails to comply with the inspection and would require the State Board of Optometry to provide specified copies of the inspection results. Because would be a crime a violation of the registered dispensing provisions would be a crime, the bill would impose a state-mandated local program

This bill, until January 1, 2019, would prohibit an individual, corporation, or firm operating as a registered dispensing optician before the effective date of the bill, or an employee of such an entity, from being subject to any action for engaging in that aforementioned unlawful conduct. Because a violation of the registered dispensing provisions would be a crime, the bill would impose a state-mandated local program. The bill would require any health plan subject to these provisions to report to the State Board of Optometry in writing that certain percentages of its locations no longer employ an optometrist by specified dates. The bill would require the State Board of Optometry to provide those reports to the Director of Consumer Affairs and the Legislature.

Under existing law, the State Board of Optometry consists of 11 members, 6 licensee members and 5 public members.

This bill would require one of the nonpublic members to be a registered dispensing optician and would require the Governor to make that appointment. The bill would establish a dispensing optician committee to advise and make recommendations to the board regarding the regulation of dispensing opticians, as provided. The bill would require the advisory committee to consist of 5 members, including 2 registered dispensing opticians, 2 public members, and a member of the State Board of Optometry.

Existing constitutional provisions require that a statute that limits the right of access to the meetings of public bodies or the writings of public officials and agencies be adopted with findings demonstrating the interest protected by the limitation and the need for protecting that interest.

This bill would make legislative findings to that effect.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

91

Exh B054

Ch. 405 — 4 —

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 655 of the Business and Professions Code is repealed.

SEC. 2.   Section 655 is added to the Business and Professions Code, to read:

655.   (a)  For the purposes of this section, the following terms have the following meanings:

(1) "Health plan" means a health care service plan licensed pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code).

(2) "Optical company" means a person or entity that is engaged in the manufacture, sale, or distribution to physicians and surgeons, optometrists, health plans, or dispensing opticians of lenses, frames, optical supplies, or optometric appliances or devices or kindred products.

(3) "Optometrist" means a person licensed pursuant to Chapter 7 (commencing with Section 3000) or an optometric corporation, as described in Section 3160.

(4) "Registered dispensing optician" means a person licensed pursuant to Chapter 5.5 (commencing with Section 2550).

(5) "Therapeutic ophthalmic product" means lenses or other products that provide direct treatment of eye disease or visual rehabilitation for diseased eyes.

(b) No optometrist may have any membership, proprietary interest, coownership, or any profit-sharing arrangement, either by stock ownership, interlocking directors, trusteeship, mortgage, or trust deed, with any registered dispensing optician or any optical company, except as otherwise permitted under this section.

(c) (1)  A registered dispensing optician or an optical company may operate, own, or have an ownership interest in a health plan so long as the health plan does not directly employ optometrists to provide optometric services directly to enrollees of the health plan, and may directly or indirectly provide products and services to the health plan or its contracted providers or enrollees or to other optometrists. For purposes of this section, an optometrist may be employed by a health plan as a clinical director for the health plan pursuant to Section 1367.01 of the Health and Safety Code or to perform services related to utilization management or quality assurance or other similar related services that do not require the optometrist to directly provide health care services to enrollees. In addition, an optometrist serving as a clinical director may not employ optometrists to provide health care services to enrollees of the health plan for which the optometrist is serving as clinical director. For the purposes of this section, the health plan's

91

utilization management and quality assurance programs that are consistent with the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code) do not constitute providing health care services to enrollees.

(2) The registered dispensing optician or optical company shall not interfere with the professional judgment of the optometrist.

(3) The Department of Managed Health Care shall forward to the State Board of Optometry any complaints received from consumers that allege that an optometrist violated the Optometry Practice Act (Chapter 7 (commencing with Section 3000)). The Department of Managed Health Care and the State Board of Optometry shall enter into an Inter-Agency Agreement regarding the sharing of information related to the services provided by an optometrist that may be in violation of the Optometry Practice Act that the Department of Managed Health Care encounters in the course of the administration of the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with section 1340) of Division 2 of the Health and Safety Code.

(d) An optometrist, a registered dispensing optician, an optical company, or a health plan may execute a lease or other written agreement giving rise to a direct or indirect landlord-tenant relationship with an optometrist, if all of the following conditions are contained in a written agreement establishing the landlord-tenant relationship:

(1) (A) The practice shall be owned by the optometrist and in every phase be under the optometrist's exclusive control, including the selection and supervision of optometric staff, the scheduling of patients, the amount of time the optometrist spends with patients, fees charged for optometric products and services, the examination procedures and treatment provided to patients and the optometrist's contracting with managed care organizations.

(B) Subparagraph A shall not preclude a lease from including commercially reasonable terms that: (i) require the provision of optometric services at the leased space during certain days and hours, (ii) restrict the leased space from being used for the sale or offer for sale of spectacles, frames, lenses, contact lenses, or other ophthalmic products, except that the optometrist shall be permitted to sell therapeutic ophthalmic products if the registered dispensing optician, health plan, or optical company located on or adjacent to the optometrist's leased space does not offer any substantially similar therapeutic ophthalmic products for sale, (iii) require the optometrist to contract with a health plan network, health plan, or health insurer, or (iv) permit the landlord to directly or indirectly provide furnishings and equipment in the leased space.

(2) The optometrist's records shall be the sole property of the optometrist. Only the optometrist and those persons with written authorization from the optometrist shall have access to the patient records and the examination room, except as otherwise provided by law.

(3) The optometrist's leased space shall be definite and distinct from space occupied by other occupants of the premises, have a sign designating

91

that the leased space is occupied by an independent optometrist or optometrists and be accessible to the optometrist after hours or in the case of an emergency, subject to the facility's general accessibility. This paragraph shall not require a separate entrance to the optometrist's leased space.

(4) All signs and displays shall be separate and distinct from that of the other occupants and shall have the optometrist's name and the word "optometrist" prominently displayed in connection therewith. This paragraph shall not prohibit the optometrist from advertising the optometrist's practice location with reference to other occupants or prohibit the optometrist or registered dispensing optician from advertising their participation in any health plan's network or the health plan's products in which the optometrist or registered dispensing optician participates.

(5) There shall be no signs displayed on any part of the premises or in any advertising indicating that the optometrist is employed or controlled by the registered dispensing optician, health plan or optical company.

(6) Except for a statement that an independent doctor of optometry is located in the leased space, in-store pricing signs and as otherwise permitted by this subdivision, the registered dispensing optician or optical company shall not link its advertising with the optometrist's name, practice, or fees.

(7) Notwithstanding paragraphs (4) and (6), this subdivision shall not preclude a health plan from advertising its health plan products and associated premium costs and any copayments, coinsurance, deductibles, or other forms of cost-sharing, or the names and locations of the health plan's providers, including any optometrists or registered dispensing opticians that provide professional services, in compliance with the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code).

(8) A health plan that advertises its products and services in accordance with paragraph (7) shall not advertise the optometrist's fees for products and services that are not included in the health plan's contract with the optometrist.

(9) The optometrist shall not be precluded from collecting fees for services that are not included in a health plan's products and services, subject to any patient disclosure requirements contained in the health plan's provider agreement with the optometrist or that are not otherwise prohibited by the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code).

(10) The term of the lease shall be no less than one year and shall not require the optometrist to contract exclusively with a health plan. The optometrist may terminate the lease according to the terms of the lease. The landlord may terminate the lease for the following reasons:

(A) The optometrist's failure to maintain a license to practice optometry or the imposition of restrictions, suspension or revocation of the optometrist's

91

license or if the optometrist or the optometrist's employee is or becomes ineligible to participate in state or federal government-funded programs.

(B) Termination of any underlying lease where the optometrist has subleased space, or the optometrist's failure to comply with the underlying lease provisions that are made applicable to the optometrist.

(C) If the health plan is the landlord, the termination of the provider agreement between the health plan and the optometrist, in accordance with the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code).

(D) Other reasons pursuant to the terms of the lease or permitted under the Civil Code.

(11) The landlord shall act in good faith in terminating the lease and in no case shall the landlord terminate the lease for reasons that constitute interference with the practice of optometry.

(12) Lease or rent terms and payments shall not be based on number of eye exams performed, prescriptions written, patient referrals or the sale or promotion of the products of a registered dispensing optician or an optical company.

(13) The landlord shall not terminate the lease solely because of a report, complaint, or allegation filed by the optometrist against the landlord, a registered dispensing optician or a health plan, to the State Board of Optometry or the Department of Managed Health Care or any law enforcement or regulatory agency.

(14) The landlord shall provide the optometrist with written notice of the scheduled expiration date of a lease at least 60 days prior to the scheduled expiration date. This notice obligation shall not affect the ability of either party to terminate the lease pursuant to this section. The landlord may not interfere with an outgoing optometrist's efforts to inform the optometrist's patients, in accordance with customary practice and professional obligations, of the relocation of the optometrist's practice.

(15) The State Board of Optometry may inspect, upon request, an individual lease agreement pursuant to its investigational authority, and if such a request is made, the landlord or tenant, as applicable, shall promptly comply with the request. Failure or refusal to comply with the request for lease agreements within 30 days of receiving the request constitutes unprofessional conduct and is grounds for disciplinary action by the appropriate regulatory agency. Only personal information as defined in Section 1798.3 of the Civil Code may be redacted prior to submission of the lease or agreement. This section shall not affect the Department of Managed Health Care's authority to inspect all books and records of a health plan pursuant to Section 1381 of the Health and Safety Code.

Any financial information contained in the lease submitted to a regulatory entity, pursuant to this paragraph, shall be considered confidential trade secret information that is exempt from disclosure under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).

Exh B058

(16)  This subdivision shall not be applicable to the relationship between any optometrist employee and the employer medical group, or the relationship between a medical group exclusively contracted with a health plan regulated by the Department of Managed Health Care and that health plan.

(e)  No registered dispensing optician may have any membership, proprietary interest, coownership, or profit sharing arrangement either by stock ownership, interlocking directors, trusteeship, mortgage, or trust deed, with an optometrist, except as permitted under this section.

(f)  Nothing in this section shall prohibit a person licensed under Chapter 5 (commencing with Section 2000) or its professional corporation from contracting with or employing optometrists, ophthalmologists, or optometric assistants and entering into a contract or landlord tenant relationship with a health plan, an optical company, or a registered dispensing optician, in accordance with Sections 650 and 654 of this code.

(g)  Any violation of this section constitutes a misdemeanor as to such person licensed under Chapter 7 (commencing with Section 3000) of this division and as to any and all persons, whether or not so licensed under this division, who participate with such licensed person in a violation of any provision of this section.

SEC. 3.   Section 2546.2 of the Business and Professions Code is amended to read:

2546.2.   All references in this chapter to the division shall mean the State Board of Optometry.

SEC. 4.   Section 2546.9 of the Business and Professions Code is amended to read:

2546.9.   The amount of fees prescribed in connection with the registration of nonresident contact lens sellers is that established by the following schedule:

(a)  The initial registration fee shall be one hundred dollars ($100).

(b)  The renewal fee shall be one hundred dollars ($100).

(c)  The delinquency fee shall be twenty-five dollars ($25).

(d)  The fee for replacement of a lost, stolen, or destroyed registration shall be twenty-five dollars ($25).

(e)  The fees collected pursuant to this chapter shall be deposited in the Dispensing Opticians Fund, and shall be available, upon appropriation, to the State Board of Optometry for the purposes of this chapter.

SEC. 5.   Section 2550.1 of the Business and Professions Code is amended to read:

2550.1.   All references in this chapter to the board or the Board of Medical Examiners or division shall mean the State Board of Optometry.

SEC. 6.   Section 2554 of the Business and Professions Code is amended to read:

2554.   Each registrant shall conspicuously and prominently display at each registered location the following consumer information:

"Eye doctors are required to provide patients with a copy of their ophthalmic lens prescriptions as follows:

Exh B059

Spectacle prescriptions: Release upon completion of exam.

Contact lens prescriptions: Release upon completion of exam or upon completion of the fitting process.

Patients may take their prescription to any eye doctor or registered dispensing optician to be filled.

Optometrists and registered dispensing opticians are regulated by the State Board of Optometry. The State Board of Optometry receives and investigates all consumer complaints involving the practice of optometry and registered dispensing opticians. Complaints involving a California-licensed optometrist or a registered dispensing optician should be directed to:

California State Board of Optometry
Department of Consumer Affairs
2450 Del Paso Road, Suite 105
Sacramento, CA 95834
Phone: 1-866-585-2666 or (916) 575-7170
Email: optometry@dca.ca.gov
Website: www.optometry.ca.gov"

SEC. 7.   Section 2556 of the Business and Professions Code is amended to read:

2556.   (a) Except as authorized by Section 655, it is unlawful for a registered dispensing optician to do any of the following: to advertise the furnishing of, or to furnish, the services of an optometrist or a physician and surgeon, to directly employ an optometrist or physician and surgeon for the purpose of any examination or treatment of the eyes, or to duplicate or change lenses without a prescription or order from a person duly licensed to issue the same. For the purposes of this section, "furnish" does not mean to enter into a landlord-tenant relationship of any kind.

(b) Notwithstanding Section 125.9, the board may, by regulation, impose and issue administrative fines and citations for a violation of this section or Section 655, which may be assessed in addition to any other applicable fines, citations, or administrative or criminal actions.

SEC. 8.   Section 2556.1 is added to the Business and Professions Code, to read:

2556.1.   All licensed optometrists in a setting with a registered dispensing optician shall report the business relationship to the State Board of Optometry, as determined by the board. The State Board of Optometry shall have the authority to inspect any premises at which the business of a registered dispensing optician is co-located with the practice of an optometrist, for the purposes of determining compliance with Section 655. The inspection may include the review of any written lease agreement between the registered dispensing optician and the optometrist or between the optometrist and the health plan. Failure to comply with the inspection or any request for information by the board may subject the party to disciplinary action. The board shall provide a copy of its inspection results, if applicable, to the Department of Managed Health Care.

Exh B060

SEC. 9.   Section 2556.2 is added to the Business and Professions Code, to read:

2556.2.   (a)  Notwithstanding any other law, subsequent to the effective date of this section and until January 1, 2019, any individual, corporation, or firm operating as a registered dispensing optician under this chapter before the effective date of this section, or an employee of such an entity, shall not be subject to any action for engaging in conduct prohibited by Section 2556 or Section 655 as those sections existed prior to the effective date of this bill, except that a registrant shall be subject to discipline for duplicating or changing lenses without a prescription or order from a person duly licensed to issue the same.

(b)  Nothing in this section shall be construed to imply or suggest that a person registered under this chapter is in violation of or in compliance with the law.

(c)  This section shall not apply to any business relationships prohibited by Section 2556 commencing registration or operations on or after the effective date of this section.

(d)  Subsequent to the effective date of this section and until January 1, 2019, nothing in this section shall prohibit an individual, corporation, or firm operating as a registered dispensing optician from engaging in a business relationship with an optometrist licensed pursuant to Chapter 7 (commencing with Section 3000) before the effective date of this section at locations registered with the Medical Board of California before the effective date of this section.

(e)  This section does not apply to any administrative action pending, litigation pending, cause for discipline, or cause of action accruing prior to September 1, 2015.

(f)  Any health plan, as defined in Section 655, subject to this section shall report to the State Board of Optometry in writing that (1) 15 percent of its locations no longer employ an optometrist by January 1, 2017, (2) 45 percent of its locations no longer employ an optometrist by August 1, 2017, and (3) 100 percent of its locations no longer employ an optometrist by January 1, 2019. The board shall provide those reports as soon as it receives them to the director and the Legislature. The report to the Legislature shall be submitted in compliance with Section 9795 of the Government Code.

SEC. 10.   Section 2567 of the Business and Professions Code is amended to read:

2567.   (a)  The provisions of Article 19 (commencing with Section 2420) and Article 20 (commencing with Section 2435) of Chapter 5 which are not inconsistent or in conflict with this chapter apply to the issuance and govern the expiration and renewal of certificates issued under this chapter. All fees collected from persons registered or seeking registration under this chapter shall be paid into the Dispensing Opticians Fund, and shall be available, upon appropriation, to the State Board of Optometry for the purposes of this chapter. Any moneys within the Contingent Fund of the Medical Board of California collected pursuant to this chapter shall be deposited in the Dispensing Opticians Fund.

successor or until one year shall have elapsed since the expiration of the term for which he or she was appointed, whichever first occurs.

(b)  Vacancies occurring shall be filled by appointment for the unexpired term.

(c)  The Governor shall appoint three of the public members, five members qualified as provided in Section 3011, and the registered dispensing optician member as provided in Section 3010.5. The Senate Committee on Rules and the Speaker of the Assembly shall each appoint a public member.

(d)  No board member serving between January 1, 2000, and June 1, 2002, inclusive, shall be eligible for reappointment.

(e)  For initial appointments made on or after January 1, 2003, one of the public members appointed by the Governor and two of the professional members shall serve terms of one year. One of the public members appointed by the Governor and two of the professional members shall serve terms of three years. The remaining public member appointed by the Governor and the remaining two professional members shall serve terms of four years. The public members appointed by the Senate Committee on Rules and the Speaker of the Assembly shall each serve for a term of four years.

(f)  The initial appointment of a registered dispensing optician member shall replace the optometrist member whose term expired on June 1, 2015.

SEC. 14.   Section 3020 is added to the Business and Professions Code, to read:

3020.   (a)  There shall be established under the State Board of Optometry a dispensing optician committee to advise and make recommendations to the board regarding the regulation of a dispensing opticians pursuant to Chapter 5.5 (commencing with Section 2550). The committee shall consist of five members, two of whom shall be registered dispensing opticians, two of whom shall be public members, and one of whom shall be a member of the board. Initial appointments to the committee shall be made by the board. The board shall stagger the terms of the initial members appointed. The filling of vacancies on the committee shall be made by the board upon recommendations by the committee.

(b)  The committee shall be responsible for:

(1)  Recommending registration standards and criteria for the registration of dispensing opticians.

(2)  Reviewing of the disciplinary guidelines relating to registered dispensing opticians.

(3)  Recommending to the board changes or additions to regulations adopted pursuant to Chapter 5.5 (commencing with Section 2550).

(4)  Carrying out and implementing all responsibilities and duties imposed upon it pursuant to this chapter or as delegated to it by the board.

(c)  The committee shall meet at least twice a year and as needed in order to conduct its business.

(d)  Recommendations by the committee regarding scope of practice or regulatory changes or additions shall be approved, modified, or rejected by the board within 90 days of submission of the recommendation to the board. If the board rejects or significantly modifies the intent or scope of the

Exh B062

— 13 —                     Ch. 405

recommendation, the committee may request that the board provide its reasons in writing for rejecting or significantly modifying the recommendation, which shall be provided by the board within 30 days of the request.

(e) After the initial appointments by the board pursuant to subdivision (a), the Governor shall appoint the registered dispensing optician members and the public members. The committee shall submit a recommendation to the board regarding which board member should be appointed to serve on the committee, and the board shall appoint the member to serve. Committee members shall serve a term of four years except for the initial staggered terms. A member may be reappointed, but no person shall serve as a member of the committee for more than two consecutive terms.

SEC. 15.  Section 3021 is added to the Business and Professions Code, to read:

3021.  The board shall have rulemaking authority with respect to Chapter 5.45 (commencing with Section 2546) and Chapter 5.5 (commencing with Section 2550) in accordance with Section 3025. Regulations adopted pursuant to Chapter 5.45 (commencing with Section 2546) and Chapter 5.5 (commencing with Section 2550) by the Medical Board of California prior to the effective date of this section shall continue to be valid, except that any reference to the board or division contained therein shall be construed to mean the State Board of Optometry, unless the context determines otherwise.

SEC. 16.  Section 3023.1 is added to the Business and Professions Code, to read:

3023.1.  (a) The nonresident contact lens seller program established under Chapter 5.45 (commencing with Section 2546) and the registered dispensing optician, spectacle lens dispensing, and contact lens dispensing programs established under Chapter 5.5 (commencing with Section 2550) are hereby transferred from the jurisdiction of the Medical Board of California and placed under the jurisdiction of the State Board of Optometry.

(b) All the duties, powers, purposes, responsibilities, and jurisdictions of the Medical Board of California under Chapter 5.45 (commencing with Section 2546) and Chapter 5.5 (commencing with Section 2550) shall be transferred to the State Board of Optometry.

(c) For the performance of the duties and the exercise of the powers vested in the board under Chapter 5.45 (commencing with Section 2546) and Chapter 5.5 (commencing with Section 2550), the State Board of Optometry shall have possession and control of all records, papers, offices, equipment, supplies, or other property, real or personal, held for the benefit or use by the Medical Board of California.

SEC. 17.  The Legislature finds and declares that Section 1 of this act imposes a limitation on the public's right of access to the meetings of public bodies or the writings of public officials and agencies within the meaning of Section 3 of Article I of the California Constitution. Pursuant to that constitutional provision, the Legislature makes the following findings to

91

Exh B063

demonstrate the interest protected by this limitation and the need for protecting that interest·

In order to allow the State Board of Optometry and the Department of Managed Health Care to fully accomplish its goals, it is imperative to protect the interests of those persons submitting information to those departments to ensure that any personal or sensitive business information that this act requires those persons to submit is protected as confidential information.

SEC. 18.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

91

Exh B064